## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

SHARON HATCHER,

           Plaintiff,

-vs-

CUYAHOGA          METROPOLITAN
HOUSING AUTHORITY,

           Defendant.

Case No. 1:20-cv-02508

JUDGE PAMELA A. BARKER

MEMORANDUM OPINION & ORDER

Currently pending is Defendant Cuyahoga Metropolitan Housing Authority's Motion for Summary Judgment.  (Doc. No. 26.)  Plaintiff Sharon Hatcher filed a Brief in Opposition to CMHA's Motion, to which CMHA replied.  (Doc. Nos. 32, 34.)  For the following reasons, CMHA's Motion for Summary Judgment is granted.

I.      **Background**

Defendant CMHA is a public housing authority in Cuyahoga County, Ohio.  It owns and manages properties and administers rent subsidy programs to provide low-income individuals and families with access to housing in Cuyahoga County.  CMHA employs more than 600 employees and posts its employment vacancies on various websites, including on Indeed.com.  (Doc. No. 26-1, PageID# 194.)  CMHA uses generic internal job titles—e.g., "Service Person V"—so CMHA's external job postings on websites like Indeed.com reflect the primary skill and/or trade sought by CMHA.[1]  (Lonnie Brown Affid., Doc. No. 26-4, ¶ 6.)  In early September 2019, CMHA uploaded a posting for a "Plumber" job onto Indeed.com.  (*Id.* at ¶ 7.)

---

[1] Though CMHA attached several examples of external job postings with titles such as "Experienced Boiler, Heating & Plumbing Technician," "Journeyman Electrician," and "CMHA Carpenter" to Brown's affidavit, neither CMHA nor

On September 18, 2019, Plaintiff Sharon Hatcher applied for CMHA's "Plumber" job through Indeed.com by submitting a copy of her resume.  (*Id.*; *see also* Hatcher Resume, Doc. No. 26-6.) According to Hatcher's resume, she was pursuing a degree in photography and filmmaking through Cuyahoga Community College, and obtained an associate degree from Cuyahoga Community College in 2017, a bachelor of science degree through Franklin University in 2003, and an associate of applied science degree from Cuyahoga Community College in 1990.  (Doc. No. 26-6, PageID# 467.)  Additionally, Hatcher indicated that she had significant experience in performing a variety of plumbing work, as well as HVAC work, carpentry, painting, and electrical work. (*Id.*)  Hatcher listed a variety of relevant work experience in her Professional Experience section, including working as a plumbing contractor since 2014 and in plant and facility maintenance for a variety of employers for 11 years.  (*Id.* at PageID# 468-69.)  Hatcher indicated that she held a master plumber contractor's license through the state of Ohio, as well as other certifications and licenses in facility management, HVAC care, and boiler management.  (*Id.* at PageID# 470.)

After receiving Hatcher's resume, CMHA's Talent Acquisition Manager Lonnie Brown immediately scheduled an in-person interview with Hatcher.  (Doc. No. 26-4, ¶¶ 8-9.)  Brown confirmed Hatcher's interview "for the **Plumbing** position with the **Cuyahoga Metropolitan Housing Authority**" by email on September 18, 2019.  (Interview Confirmation E-mail, Doc. No. 32-4, emphasis in original.)  Brown and CMHA's Director of Property Maintenance Ronald King interviewed Hatcher on September 19, 2019.  (*Id.*)  According to CMHA, Brown and King explained that Hatcher was interviewing for a "Service Person V" position and that, while the primary job focus would be on plumbing-related work, all Service Person Vs were expected to complete additional job

---

Hatcher provided a copy of the September 2019 "Plumber" job posting to which Hatcher applied on Indeed.com.  (*See* Doc. No. 26-4, PageID# 341-45.)

2

duties, including trash and snow removal and other tasks.  (*Id.* at ¶ 10.)  Brown and King also explained that Hatcher would be required to use her personal vehicle and standard tools, but that CMHA would reimburse her for her gas mileage and would provide any customized tools necessary to complete a task.  (*Id.* at ¶ 11.)  However, according to Hatcher, she never received a job description for the Service Person V position and neither Brown nor King explained to her during her interview that, in addition to her plumbing duties, she was also responsible for picking up trash and snow. (Hatcher Depo. Trans., Doc. No. 26-7, PageID# 486.)

Thereafter, CMHA offered Hatcher the position of Service Person V, at a starting rate of $20.28 per hour.  (Hatcher Offer Letter, Doc. No. 26-9.)  On October 3, 2019, Hatcher signed an offer letter from CMHA accepting the Service Person V position.  (*Id.*)  Hatcher began her new job as a Service Person V on October 7, 2019.  (Doc. No. 26-4, ¶ 13.)  On Hatcher's first day, Brown assigned Hatcher to work at the Carver Park Asset Management Project ("AMP").  (*Id.* at ¶ 21.)  Hatcher testified that she was not told during her interview that she would be assigned to a specific estate, but was told that she would be assigned to the central maintenance shop.  (Doc. No. 26-7, PageID# 493.)

The next day, on October 8, 2019, Hatcher appeared, unannounced, at CMHA's central human resources office to meet with Brown.  (Doc. No. 26-4, ¶ 22.)  Hatcher expressed several complaints to Brown, including that she was required to drive her own vehicle, rather than being assigned a company car, that she was required to use her own tools, and that Carver Park's maintenance supervisor was disorganized and unprepared for Hatcher's arrival.  (*Id.* at ¶¶ 22-23.)

Thereafter, Brown reviewed Hatcher's complaints with CMHA's Director of Human Resources Betsy McCafferty.  (*Id.* at ¶ 24.)  Brown and McCafferty decided to reassign Hatcher to the Far West AMP because Far West had a need for a plumber, and because Far West had more

experienced leaders, including AMP Leader Nancy Oliveras-Eakins and Maintenance Supervisor Nigel Chung.  (*Id.*)  Brown met with Hatcher on October 14, 2019 to notify her of the reassignment. (*Id.* at ¶ 25.)

On Hatcher's first day at Far West, she met with Oliveras-Eakins and Chung, who gave her a partial tour of Far West.  (Oliveras-Eakins Affid., Doc. No. 26-11, ¶¶ 6-7.)  Hatcher complained to Oliveras-Eakins and Chung about being required to perform non-plumbing tasks, using her personal vehicle, and using her standard plumbing tools.  (*Id.* at ¶ 7; Chung Affid., Doc. No. 26-12, ¶ 7.)  Both Oliveras-Eakins and Chung explained to Hatcher that, as a Service Person V, she was expected to perform non-plumbing tasks, including garbage removal and shoveling snow.  (*Id.*)  Oliveras-Eakins explained to Hatcher that she would first be assigned to plumbing tasks, but once those were completed, Hatcher would be expected to complete other non-plumbing tasks as assigned.  (Doc. No. 26-11, ¶ 8.)  Additionally, Oliveras-Eakins asked Hatcher to create a list of additional plumbing tools that Hatcher believed she would need, and that Oliveras-Eakins would submit the list to Chung for review.  (*Id.*)  Finally, Oliveras-Eakins assigned Hatcher to work only at the Bellaire Garden-B building, rather than assigning Hatcher to the entire Far West AMP, as the Bellaire Garden-B building had plumbing needs, and servicing a single building would reduce the need for Hatcher to drive her personal vehicle to various service calls.  (*Id.*)

At some point after her reassignment to Far West, Hatcher again complained to Brown about having to use her vehicle and about having to complete certain job duties, including picking up trash. (Doc. No. 26-8, ¶ 26.)  Brown averred that she again expressed surprise about Hatcher's complaints because she told Hatcher in her interview that Hatcher would be required to use her own vehicle and perform non-plumbing tasks, including picking up trash.  (*Id.*)

During Hatcher's brief tenure at Far West, she interacted with two white male CMHA plumbers while working in Bellaire Gardens. (Doc. No. 26-7, PageID# 487.) According to Hatcher, these plumbers told her they earned $28 per hour and that they were classified as Service Person Vs but were not assigned to a particular estate and instead worked out of the central maintenance shop. (*Id.* at PageID# 487, 495.) Hatcher also testified that these plumbers told her she should not be assigned to a specific estate, but to central maintenance, and that she should be making more money. (*Id.*) At her deposition, Hatcher could not recall any details about the men's appearances or their names. (*Id.* at PageID# 489, 494.) CMHA posits that these plumbers were two white male Service Person IVs named Richard Roginski and Lee Johnson, both of whom made approximately $16 per hour in October 2019 and were assigned to the Far West AMP at that time. (Doc. No. 26-4, ¶¶ 33-34.) According to CMHA, there were no other Service Person Vs assigned to the Far West AMP at that time. (*Id.* at ¶ 29.)

At some point during Hatcher's time at Far West, she also interacted with an unknown maintenance employee assigned to the Bellaire Gardens-B building. (Doc. No. 26-12, ¶ 9.) According to Chung, he received a phone call from the maintenance employee who complained that when he asked Hatcher for help in maneuvering a trash dumpster, Hatcher refused to help him. (*Id.*)

On October 22, 2019, Hatcher did not report to work at the Far West AMP. (Doc. No. 26-11, ¶ 28.) Instead, Hatcher arrived, again unannounced, at CMHA's Human Resources Department to meet with Brown. (*Id.* at ¶ 27.) Hatcher again told Brown that she refused to perform non-plumbing related tasks and protested using her own vehicle and tools. (*Id.*) Brown again told Hatcher that all Service Person Vs were expected to perform non-plumbing related duties, including picking up trash and removing snow. (*Id.*) According to Brown, Hatcher ended this meeting by telling Brown that

5

she was unhappy at CMHA and no longer wished to work there, but that CMHA would have to fire her because she refused to quit.  (*Id.*)

That same day, on October 22, 2019, at 9:22 a.m., Bellaire Gardens Property Manager Marguerita Hernandez emailed Hatcher, asking her to address and close out six priority work orders by the end of the day, per CMHA's policy of closing priority work orders within 48 hours.[2] (Hernandez Affid., Doc. No. 26-15, ¶¶ 4, 9.)  At 1:30 p.m. that same day, Hatcher sent a lengthy response to Hernandez.  (*Id.* at ¶ 11.)  In her email to Hernandez, Hatcher opened with: "Allow me to first mention the two negative encounters with you."  (Hatcher Email, Doc. No. 26-16, PageID# 599.)  Hatcher described one encounter in which Hernandez did not extend a greeting to Hatcher, or to two other residents, when Hernandez entered the office.  (*Id.*)  Hatcher accused Hernandez of rolling her eyes after Hatcher said hello and offering no response to Hatcher's greeting.  (*Id.*)  Next, Hatcher described another encounter in which she attempted to retrieve keys for Bellaire Gardens-A from the office.  (*Id.*)  According to Hatcher, the office door was locked and so Hatcher knocked on the door.  Hatcher wrote that she could hear Hernandez asking "Who is it?," and that Hatcher continued to knock until Hernandez came to the door.  (*Id.* at PageID# 600.)  Hatcher also addressed Hernandez's request that Hatcher resolve the six outstanding work orders by the end of the day.  (*Id.*) Hatcher wrote that, "[b]ased on the content of your email you have assumed I have not addressed those W/Os outlined."  However, Hatcher asserted she had indeed either addressed the orders but had not yet closed them, or else had assessed the problem and needed to return to complete the work. (*Id.*)  Hatcher told Hernandez that, "rather than assume, the better approach is to make an inquiry" as

---

[2] Hernandez also included another CMHA employee, Jose Lopez Estrada, on the October 22, 2019 email.  (*See* Hatcher Email, Doc. No. 26-16, PageID# 600-01.)  Hernandez asked Lopez Estrada to close out one priority work order by the end of the day.

to whether Hatcher had completed the work orders.  (*Id.*)  Hatcher further complained that she had to work the entire property by herself the previous day without taking a lunch and explained that she was "a licensed plumber, not a miracle worker."  (*Id.*)  Finally, Hatcher closed her email asking that Hernandez allow her to "execute [her] skills as a knowledgeable plumber," and that she "[did] not require micromanaging."  (*Id.*)

Hernandez was offended by the tone of Hatcher's email and believed that Hatcher's recitation of her prior interactions with Hernandez was incorrect.  (Doc. No. 26-15, ¶ 12.)  After she received Hatcher's email, Hernandez called Chung and explained that she was offended by the email.  (*Id.* at ¶ 13.)  Hernandez also forwarded Hatcher's email to Cedra Westbrook, CMHA's Human Resources Employee Relations Manager.  (*Id.* at ¶14.)  At that point, CMHA's Human Resources Department decided to schedule a Pre-Disciplinary Conference ("PDC") with Hatcher to address Hatcher's email to Hernandez, as well as Hatcher's refusal to perform non-plumbing tasks.  (Westbrook Affid., Doc. No. 26-17, ¶ 7.)  CMHA issued an Interoffice Memorandum, addressed to Hatcher, on October 23, 2019, with the subject "Pre-Disciplinary Conference."  (PDC Memo, Doc. No. 26-19.)  When Hatcher's supervisor Chung attempted to hand the PDC Memo to Hatcher, Hatcher refused to sign it. (Doc. No. 26-12, ¶ 11; *see also* Doc. No. 26-19.)

CMHA conducted Hatcher's PDC on October 23, 2019.  (Doc. No. 26-17, ¶ 9.)  Hatcher, Westbrook, and Oliveras-Eakins attended the PDC, as well as Hatcher's union representative, Melissa Floyd.  (Westbrook Depo., Doc. No. 32-2, PageID# 712; Doc. No. 26-17, ¶ 9.)  Westbrook acted as CMHA's fact finder during the PDC and took notes of the proceedings, but did not ask Hatcher any questions herself.  (Doc. No. 32-2, PageID# 690, 740-42.)  During the PDC, Oliveras-Eakins addressed Hatcher's email and her insubordination towards Hernandez.  (Doc. No. 32-2, PageID#

736-37.)  Oliveras-Eakins also addressed the problem of Hatcher repeatedly visiting CMHA's central human resources office without reporting to her assigned workplace.  (*Id.* at PageID# 745.) According to Westbrook's notes, Hatcher brought up that she refused to pick up trash or remove snow because she believed she should only have to perform plumbing-related tasks.  (*Id.* at PageID# 736-37.)  Hatcher also complained that the PDC was unfair to her, that she applied for the position of "plumber," and that she was not hired to "do grounds" or pick up trash.  (*Id.* at PageID# 747-48.) Westbrook further noted that Hatcher said she was "done with CMHA" and that CMHA would have to fire her because she was not quitting.  (*Id.* at PageID# 748.)  Hatcher also described her hiring as a "bait and switch," referring to CMHA's expectation that she pick up trash and shovel snow in addition to completing her plumbing duties.  (*Id.*)

After the PDC concluded, Westbrook met with McCafferty and CMHA's Deputy Director of Human Resources Ronaye Steele.  (Doc. No. 26-17, ¶ 18.)  In her affidavit, Westbrook averred that she presented the facts that she gathered from the PDC to McCafferty and Steele, though she could not recall the specifics of her discussion with McCafferty and Steele during her deposition.  (Doc. No. 26-17, ¶ 18; Doc. No. 32-2, PageID# 709-10.)  According to Westbrook's affidavit, McCafferty and Steele asked Westbrook to recommend a course of discipline for Hatcher based on the facts gathered during the PDC.  (Doc. No. 26-17, ¶ 18.)  Westbrook averred that she recommended that it would be in the interests of both CMHA and Hatcher to terminate Hatcher's employment.  (*Id.*) Westbrook averred that both McCafferty and Steele agreed with her recommendation.  (*Id.*)  Again, Westbrook did not recall the specifics of her discussion with McCafferty and Steele about her recommendation to terminate Hatcher's employment during her deposition.  (Doc. No. 32-2, PageID# 711.)

8

On October 24, 2019, CMHA sent a letter to Hatcher terminating her employment.  (Hatcher Termination Letter, Doc. No. 32-9.)  The letter noted that Hatcher participated in a PDC to discuss possible violations of CMHA's Personnel Policies and Procedures Manual, including incompetency or inefficiency in performing her duties, disrespectful treatment of supervisors, violation of CMHA rules and regulations, disruptive activity in the workplace, insubordination, acts of malfeasance, misfeasance, or nonfeasance, and conduct unbecoming an employee in public service.  (*Id.*)  CMHA concluded that, pursuant to a review of the facts presented at the PDC, it was determined that Hatcher violated the above provisions of CMHA's Personnel Policies and Procedures Manual.  (*Id.*)  Specifically, CMHA substantiated that she "exhibited rude and disrespectful behavior toward management," that she refused to complete work assignments at both Carver Park and Far West, and that, when informed that she needed to close work orders in a timely manner, Hatcher "responded in a negative tone."  (*Id.*)  CMHA further noted that during the PDC, Hatcher "emphatically stated that although hired as a Service Person V [she] will only do certain jobs."  (*Id.*)  Thus, CMHA concluded that Hatcher's conduct was of a grievous nature, violated CMHA's policies and procedures, and would not be tolerated by CMHA.  (*Id.*)  CMHA terminated Hatcher's employment, effective October 23, 2019.  (*Id.*)

Thereafter, Hatcher filed an initial complaint in this matter on November 6, 2020.  (Doc. No. 1.)  Although Hatcher proceeded initially in this matter pro se, she obtained representation on August 17, 2021.  (Doc. No. 14.)  Shortly thereafter, she moved to amend her complaint on August 19, 2021.  (Doc. No. 17.)  CMHA did not oppose Hatcher's late attempt to amend her complaint and the Court granted her motion to amend on August 24, 2021.  (8/24/2021 Minutes of Proceedings of telephonic status conference; 8/24/2021 ECF non-document order granting Plaintiff's Motion to Amend

Complaint.)  Thus, Hatcher's Amended Complaint became the operative pleading.  (*See* Doc. No. 17-1.)  In her Amended Complaint, Hatcher alleges four causes of action against CMHA: race discrimination in contravention of Title VII and the Ohio Civil Rights Act, and retaliation in contravention of Title VII and the Ohio Civil Rights Act.  (Doc. No 17-1, ¶ 12.)

On January 10, 2022, CMHA filed the instant Motion for Summary Judgment.  (Doc. No. 26.)  On February 23, 2022, Hatcher filed a Brief in Opposition to CMHA's Motion, to which CMHA replied on March 9, 2022.  (Doc. Nos. 32, 34.)  Thus, CMHA's Motion is now ripe for a decision.

## II.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.,* 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts

10

of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.    Analysis

The Court analyzes Hatcher's claims under Title VII and the Ohio Civil Rights Act together, as "Ohio's requirements are the same as under federal law."  *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)); *see also Lindsey*, 295 F. App'x at 760 n.1 ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims."); *see* 42 U.S.C. §§ 2000e-2, 2000e-3; Ohio Rev. Code § 4112.02.  Accordingly, the Court will turn first to Hatcher's discrimination claims before analyzing her retaliation claims.

### A.    Discrimination

CMHA asserts that Hatcher cannot establish a prima facie case of discrimination because she did not remain qualified for the Service Person V position and also because Hatcher failed to identify

any similarly situated, nonminority comparator that either replaced her or received better treatment than Hatcher did. (Doc. No. 26-1, PageID# 207-10; Doc. No. 34, PageID# 808-11.) CMHA further asserts that even if Hatcher could establish a prima facie case of discrimination, it has offered legitimate, non-discriminatory reasons for Hatcher's termination that she cannot show are pretextual. (*Id.*) In response, Hatcher asserts that she was qualified for the plumber role and also that she need not identify a replacement because CMHA's behavior towards Hatcher was clearly racist. (Doc. No. 32, PageID# 659-61.) The Court agrees with CMHA that Hatcher cannot establish a prima facie case of discrimination.

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). In the absence of direct evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Kroger*, 319 F.3d at 865-66. Under this framework, "the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination." *Id.* at 866. To establish a prima facie case of discrimination, a plaintiff must "show that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000). "The establishment of a prima

12

facie case creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action."  *Kroger*, 319 F.3d at 866 (quoting *Univ. of Cincinnati*, 215 F.3d at 573). Finally, "[i]f the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.*

### 1.    Prima Face Case of Discrimination

### a)    Second Prong: Qualified for Job and Performing Satisfactorily

To be qualified for a position, a plaintiff must demonstrate "that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999).  In this case, there is a fact issue surrounding CMHA's legitimate expectations of a Service Person V, as communicated to Hatcher during her job interview.  CMHA proffered two affidavits in which Brown and King each averred that they clearly explained to Hatcher during her interview that she was interviewing for a Service Person V position, and that she was required to complete periodic non-plumbing tasks, including trash and/or snow removal, as a Service Person V.  (Doc. No. 26-4, ¶ 10; Doc. No. 26-8, ¶ 7.)  However, during her deposition, Hatcher testified that no one told her during her job interview that she would have other job duties and responsibilities as a Service Person V, in addition to her plumbing duties.  (Doc. No. 26-7, PageID# 486.)  Neither party proffered the Service Person V job description as evidence, nor was there any deposition evidence from either Brown or King, or any evidence that Hatcher received and/or reviewed a job description that indicated that a Service Person V would be expected to complete non-plumbing-related tasks.  Thus, there is factual dispute over whether CMHA communicated its legitimate expectations for the Service Person V role before Hatcher accepted the

13

job on October 3, 2019.  The Court will not weigh CMHA's affidavits against Hatcher's testimony. However, for the reasons discussed below, Hatcher's discrimination claims fail for multiple other reasons and so the Court need not decide whether Hatcher was qualified for and satisfactorily performing the position of Service Person V at the time of her termination.

### b) Fourth Prong: Similarly Situated Comparators, Other Evidence Suggesting Discrimination

With respect to the fourth prong of the prima facie case, a plaintiff must demonstrate that she "was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class."  *Univ. of Cincinnati*, 215 F.3d at 572-73.  To be considered "similarly situated," the situation of the comparator must be "similar to the plaintiff in all relevant aspects."  *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011).  However, the Supreme Court has also emphasized that *McDonnell Douglas*'s prima facie standard is not "inflexible" and that the specific proof required of the plaintiff in a particular case is "not necessarily applicable in every respect in differing factual situations." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 n.6 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802, n.13).  Thus, if there are no similarly situated comparators who either replaced the plaintiff or were treated more favorably than the plaintiff, "the Sixth Circuit allows other evidence that is 'sufficient to create an inference of discrimination' to establish a prima facie case."  *Faure v. Ohio State Univ.*, No. 2:19-cv-1949, 2021 WL 5918914, at *10 (S.D. Ohio Dec. 14, 2021) (citing *Shah v. General Electric Co.*, 816 F. 2d 264, 268 (6th Cir. 1987); *see also, e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ("Although the District Judge found no prima facie case had been established by Plaintiff because of the lack of the fourth 'replaced-by-a-'non-protected'-person' element of the *McDonnell*

14

*Douglas/Burdine* criteria, a plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that 'a comparable non-protected person was treated better'.")

> For example,

> [i]n *Lindsay v. Yates*, the Sixth Circuit found that the plaintiffs met the fourth element of their prima facie case for race discrimination in housing even though they did not present evidence of similarly situated individuals who were treated more favorably. 578 F.3d 407, 417-18 (6th Cir. 2009) (inferring discrimination because of the suspicious timing of the defendants' termination of the purchasing agreement—within a few days after the seller discovered the buyers were African American). The Court noted that "so long as additional evidence exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in light of common experience, the required inference of discrimination can be made in satisfaction of the prima facie case." *Id.* (citations omitted*); see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530 (6th Cir. 2007) (inferring discrimination where the supervisor "(1) repeatedly mocked [the plaintiff's] age, (2) removed [the plaintiff] from a lucrative account because of his age, and (3) told other employees that he wanted younger salesmen."); *Jefferson v. Intelligrated, Inc.*, No. 1:18-cv-00894, 2021 WL 4224714, at *—— ——, 2021 U.S. Dist. LEXIS 176066, at *15–16 (S.D. Ohio, Sept. 16, 2021) (inferring discrimination where the defendant employer transferred several of plaintiff's business accounts to white employees despite evidence that the plaintiff performed better than the white employees).

*Faure*, 2021 WL 5918914, at *10.

The Court concludes that Hatcher offers no evidence of any similarly situated, non-protected individual who either replaced her or was treated more favorably than her. At most, Hatcher offers unsubstantiated allegations in her Amended Complaint that she had a single conversation with two unknown white male plumbers, who told her that they were better paid than she was, and that they were not expected to pick up garbage. (Doc. No. 17-1, ¶ 7.) However, at the summary judgment stage, Hatcher offers no evidence to substantiate these allegations. She was unable to identify the two male plumbers by name or physical description during her deposition. (Doc. No. 26-7, PageID# 489, 494.) Further, Hatcher never testified that these men were not required to pick up garbage. (*Id.*) There is no evidence in the record that the two unnamed white male plumbers with whom Hatcher

15

spoke were exempt from the job requirement that they pick up trash and/or remove snow in addition to their primary plumbing responsibilities. Moreover, CMHA proffered evidence that the white male plumbers with whom Hatcher spoke were not Service Person Vs from CMHA's central maintenance department, but likely two Service Person IVs assigned to the Far West AMP and who were paid approximately $16 per hour, less than Hatcher's salary. (*See, e g.,* Doc. No. 26-4, ¶ 29.) Thus, there is at least some evidence that Hatcher may have received *better* treatment than the two white male plumbers because she made more money per hour and had a higher job classification.

The Court further concludes that Hatcher fails to offer any "additional evidence" that would "indicate[ ] discriminatory intent" in this case. *Lindsay*, 578 F.3d at 417-18. Instead, Hatcher supports her conclusory accusations of racial bias on irrelevant Internet opinion pieces and social science research which have nothing to do with the facts of this case. (Doc. No. 32, PageID# 662-63.) The Court agrees with CMHA that Hatcher's citation to *Lindsay v. Yates* is inapposite because, unlike in *Lindsay*, there is no record evidence whatsoever upon which to make an "inference of discrimination." *Lindsay*, 578 F.3d at 416-17. Further, Hatcher's citation to *George v. Leavitt* is also unpersuasive because the *George* plaintiff presented conflicting evidence at the summary judgment stage about her job performance, relationships with coworkers, and reasons for her termination. *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005). In particular, the plaintiff proffered evidence that white male engineers in her office "escaped discipline despite engaging in verbal arguments and incorrectly handling Hotline messages, the same conduct for which George allegedly was fired." *Id.* at 414. Hatcher, on the other hand, proffered no such evidence (other than her unsubstantiated allegations about two unknown white plumbers, *see supra*) that any nonprotected employees received better treatment than she did, or were not terminated for similar conduct to

16

Hatcher, or that CMHA *ever* considered Hatcher's race in any way. Accordingly, the Court concludes that Hatcher is unable to establish the fourth prong of her prima facie case and, thus, her discrimination claims necessarily fail.

### 2. Pretext

Even if the Court assumed that Hatcher *could* establish a prima facie case of discrimination, the Court nevertheless concludes that Hatcher fails to demonstrate that CMHA's proffered legitimate, nondiscriminatory reason for terminating Hatcher's employment is pretext for discrimination. Thus, her discrimination claims still fail.

CMHA articulated several legitimate, nondiscriminatory reasons for terminating Hatcher's employment. In Hatcher's termination letter, CMHA explained that, following Hatcher's in-person pre-disciplinary conference, CMHA substantiated that Hatcher:

> exhibited rude and disrespectful behavior toward management; that more than once [Hatcher] refused to complete assignments given to [her] at both Carver Park and the Far West Estates. Additionally, when [Hatcher was] informed that priority work order[s] needed to be closed in a timely manner, [she] responded in a negative tone. Further, during the pre-discipinary conference [Hatcher] emphatically stated that although hired as a Service Person V [she] will only do certain jobs. Consequently, [Hatcher's] conduct in these matters as outlined above is of a grievous nature, violate[s] the Policies and Procedures that govern the conduct of employee[s] and is of u[t]most concern, and cannot and will not be tolerated by the Authority.

(Doc. No. 26-14.) Based on those reasons, CMHA terminated Hatcher's employment effective October 23, 2019. (*Id.*)

Thus, having articulated a legitimate, nondiscriminatory reason for Hatcher's termination, the burden shifts back to Hatcher to demonstrate that CMHA's proffered reason is pretextual. A plaintiff may establish pretext by showing the defendant's reason for termination: (1) lacked a basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the

17

adverse employment action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). To show pretext, Plaintiff must show "more than a dispute over the facts upon which the discharge was based." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). She must show "sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants] intentionally discriminated against [her]." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).

Here, Hatcher makes no real argument about pretext, other than to assert that:

An employer's proffered justification for adverse action is a pretext when it demonstrates such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' that a reasonable factfinder could rationally [find] it unworthy of credence. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Plaintiff has a case.

(Doc. No. 32, PageID# 664.)  Hatcher offers no evidence whatsoever to demonstrate that CMHA's reasons either lacked a basis in fact, did not actually motivate its decision to terminate Hatcher, or were insufficient to warrant the adverse action.  Hatcher's quotations from various Internet opinion pieces and general social science research are irrelevant to the facts of Hatcher's case.  (*Id.* at PageID# 662-63.)  Indeed, there is significant record evidence that Hatcher sent an insubordinate email to Hernandez, that Hatcher repeatedly visited the CMHA Human Resources Department without either notifying her supervisors of her location or without reporting to work altogether, and that she failed to close work orders in a timely manner in compliance with CMHA policy.  (*See* Doc. No. 32-8; Doc. No. 26-4, ¶¶ 27-28.)  There is further evidence that these facts motivated CMHA's decision to terminate Hatcher's employment.  (*See* Doc. No. 32-2, PageID# 742-48; Doc. No. 32-9.)

Hatcher offers no evidence to refute CMHA's proffered reasons for terminating her employment, or any other inferential evidence of race discrimination.  *See Sexstella-Wright v.*

18

*Sandusky City School Dist.*, No. 1:05-cv-1136, 2006 WL 3526791, at *6 (N.D. Ohio Dec. 6, 2006), *aff'd*, 258 Fed. App'x 837 (6th Cir. 2007). There are no allegations of any racial-related statements made to or about Hatcher by any CMHA employee. There is no evidence of racial animus (beyond Hatcher's counsel's conclusory assertions) towards Hatcher by any CMHA employee. Accordingly, the Court concludes that Hatcher fails to establish that CMHA's proffered reasons for her termination were pretextual. The Court concludes that Hatcher's discrimination claims fail and grants summary judgment in CMHA's favor.

## B. Retaliation

CMHA argues that Hatcher fails to make a prima facie showing of retaliation because she cannot prove that she engaged in protected activity, that CMHA knew of Hatcher's protected activity, or that there was a causal connection between Hatcher's protected activity and her termination. (Doc. No. 26-1, PageID# 213-14; Doc. No. 34, PageID# 813-14.) Further, CMHA argues that, even if Hatcher could establish a prima facie case of retaliation, Hatcher fails to demonstrate that CMHA's proffered legitimate, nondiscriminatory reason for terminating her employment was pretext for retaliation. (*Id.*) Hatcher argues that CMHA subjected her to a bait-and-switch by hiring her as a plumber but demanding she work as a garbage collector instead. (Doc. No. 32, PageID# 665-67.) She also claims that she complained that two white male plumbers were not tasked with garbage collection and that they were assigned company tools and vehicles. (*Id.*) She further argues that her refusal to pick up trash was a protected activity. (*Id.*) Hatcher argues that there was a causal connection between her complaints and termination due to their close temporal proximity. (*Id.*) Finally, Hatcher asserts that her argument as to pretext regarding her discrimination claims applies with equal force to her retaliation claims. (*Id.*) The Court agrees with CMHA that Hatcher has failed

to establish a prima facie case of retaliation because she has not shown that she engaged in protected activity.  Further, even if Hatcher could establish a prima facie case of retaliation, the Court concludes that her claims nevertheless fail because she fails to establish that CMHA's reasons for terminating her employment were pretext for retaliation.

Title VII provides, in relevant part, as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  "Thus, this section prohibits an employer from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII; and prohibits an employer from retaliating against an employee who has 'participated' in any manner in an investigation under Title VII."  *Univ. of Cincinnati*, 215 F.3d at 578.

As with discrimination claims, a plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in retaliation.  *Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 291 (6th Cir. 2017).  Here, Hatcher has not offered any direct evidence in support of her retaliation claim.  Consequently, the *McDonnell Douglas* burden-shifting framework applies.  *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013).  "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation."  *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014).  "If the plaintiff succeeds in making out the elements of a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions."  *Id.*  Finally, "[i]f the defendant satisfies its burden of production, the burden

20

shifts back to the plaintiff to demonstrate that the defendants' proffered reason was not the true reason for the employment decision." *Id.*

"To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendants knew of her protected activity; (3) thereafter, the defendants took 'materially adverse' actions against the plaintiff; and (4) the protected conduct was a but-for cause of the adverse action."  *Id.*

With respect to the first element, "[w]hile a plaintiff need not file a formal charge of discrimination with the EEOC in order to engage in statutorily protected activity for purposes of Title VII, an employee may not invoke the protections of the statute merely 'by making a vague charge of discrimination.'"  *Weltman v. Panetta*, No. 1:11CV 1229, 2012 WL 4955286, at *5 (N.D. Ohio Oct. 16, 2012) (quoting *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007)).  "Rather, the employee must specifically make a complaint of an 'unlawful' employment practice."  *Id* (granting summary judgment with respect to plaintiff's retaliation claim because "[h]e never told Gibson or any of Gibson's supervisors that he thought Gibson's practice was unlawful or violated his rights under Title VII").[3]

For example, in *Booker v. Brown & Williamson Tobacco Co., Inc.*, the plaintiff sent a letter to the defendant's human resources department alleging that his supervisor stated "I don't know if these people can comprehend asset management" in reference to African Americans and that recent criticism of the plaintiff's job performance was a "case of ethnocism."  879 F.2d 1304, 1309 (6th Cir. 1989).  In considering the plaintiff's claim that the defendant had retaliated against him because of his letter, the Sixth Circuit found that plaintiff had not engaged in any protected activity.  With regard

---

[3] However, the plaintiff need only have "a reasonable and good faith belief that the opposed practices were unlawful." *Univ. of Cincinnati*, 215 F.3d at 579 (citation omitted).

to the allegation of "ethnocism," the court held that the charge was too vague to invoke the protections of Title VII.  *Id.* at 1313.  Also, the court found that the plaintiff's complaint regarding his supervisor's racist statement did not allege that the defendant was "engaging in [an] unlawful employment practice, but that one of its employees has a racial intolerance," and therefore was not protected.  *Id.*; *see also Addison v. Services to Enhance Potential, Western Wayne*, No. 17-11278, 2018 WL 7048462, at *4 (E.D. Mich. Nov. 27, 2018) ("Addison's complaint is not that STEP engaged in an unlawful employment practice, which he opposed, but that McGuire was inappropriate and rude to him because of his race.  He does not explain how McGuire's actions violated Title VII.  Accordingly, his threat to report her conduct was not protected activity under the opposition clause.").

The Court concludes that Hatcher fails to establish that she engaged in protected activity.  The Court agrees with CMHA that Hatcher presents no evidence that she engaged in any activity that could be considered protected under Title VII.  For Hatcher's statements to be protected, they must amount to opposition to an unlawful employment practice by CMHA.  *Fox*, 510 F.3d at 591 (citing *Booker*, 879 F.2d at 1313).  In other words, for Hatcher's complaints to be deemed protected activity under Title VII, Hatcher must have referenced alleged acts of discrimination by CMHA.  *Id.*  There is only one complaint by Hatcher that could arguably invoke Title VII complaints: Hatcher's complaint to McCafferty.  According to Hatcher, she told McCafferty that she, Hatcher, had issues "as an African-American female being hired as a plumber but being asked to do job-related duties that were not addressed during the job interview."  (Doc. No. 26-7, PageID# 492.)  However, this complaint relates only to Hatcher's repeated dissatisfaction that CMHA expected her to complete non-plumbing-related job duties.  CMHA asking Hatcher to complete non-plumbing-related tasks is not a violation of Title VII.  Hatcher never complained to McCafferty—or anyone else at CMHA—

that CMHA was engaged in an unlawful employment practice by asking a Black woman to periodically assist in picking up trash and/or removing snow as part of her job duties. Although there is a fact issue as to whether CMHA told Hatcher during her interview that Service Person Vs are expected to perform non-plumbing tasks, there is absolutely *no* indication that CMHA based its request that Hatcher sometimes pick up trash and/or remove snow on Hatcher's race.

Further, Hatcher's complaint in this case does not even rise to the vague charge of discrimination at issue in *Booker*. At most, Hatcher has provided evidence that she made one complaint to McCafferty in which Hatcher invoked her race and complained, again, about CMHA's insistence that Hatcher complete certain non-plumbing-related job duties. This single reference to her race, combined with a repeated complaint about the correctness of CMHA's decision to require Hatcher to sometimes pick up trash and/or collect snow, is not a specific complaint about discrimination. *See also, e.g., Nasrallah v. Robert Half Int'l*, No. 1:19-cv-00795, 2020 WL 1862657, at *10 (N.D. Ohio Apr. 14, 2020) (concluding that the plaintiff's objection to and correction of a coworker's statements regarding Arabs was not a specific complaint that the coworker had discriminated against the plaintiff or had otherwise engaged in any other unlawful employment practice).

There is no other evidence in the record that Hatcher made any complaint that could be construed to fall within Title VII's protection. The remainder of Hatcher's complaints to CMHA personnel involved her repeated complaints about picking up trash, not receiving a company vehicle, and not being provided with company tools. (*Id.* at PageID# 490, 492.) Such complaints contest the "correctness of a decision made by [Hatcher's] employer," rather than assert discrimination under Title VII. *Willoughby v. Allstate Ins. Co.*, 104 Fed. App'x 528, 531 (6th Cir. 2004). Thus, the Court

concludes that Hatcher fails to establish the first prong of her prima facie case for retaliation and, therefore, her retaliation claims necessarily fail.

Moreover, even if the Court assumes that Hatcher could establish a prima facie case of retaliation, her retaliation claims still fail because she does not demonstrate that CMHA's proffered reasons for terminating her employment were pretextual.  Hatcher refers the Court back to her argument regarding pretext as set forth in her discussion of her discrimination claims.  (Doc. No. 32, PageID# 667.)  Therefore, for the reasons discussed in Section III.A.2., *supra*, the Court concludes that Hatchers fails to offer any evidence of pretext.  The Court concludes that Hatcher's retaliation claims fail and grants summary judgment in CMHA's favor.

## IV.    Conclusion

For all the reasons set forth above, CMHA's Motion for Summary Judgment (Doc. No. 26) is GRANTED.

**IT IS SO ORDERED.**


                                                     *s/Pamela A. Barker*
                                                     PAMELA A. BARKER
Date: June 13, 2022                                  U. S. DISTRICT JUDGE

24